**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:26-cr-18 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| TRAVIS MATTHEWS, | : | |
| | : | |
| Defendant. | : | |

---

**ENTRY AND ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND STATEMENTS (DOC. NO. 17)**

---

Currently before the Court is Defendant Travis Matthews' ("Matthews") Motion to Suppress Evidence and Statements (Doc. No. 17) (the "Motion") and Brief in Support of Motion to Suppress (Doc. No. 23). Matthews was indicted for allegedly possessing with the intent to distribute cocaine. (*See* Doc. No. 4 at PageID 50.) By his Motion, Matthews seeks to suppress any evidence and statements obtained through the execution of two search warrants. (*See* Doc. No. 17 at PageID 41.) For the reasons articulated herein, the Court **DENIES** Matthews' Motion.

## I. BACKGROUND

As indicated, Matthews seeks to suppress all evidence and statements gleaned from the execution of two search warrants. The first search warrant ("Search Warrant 1") authorized the search of 650 Yale Avenue, Dayton, Ohio 45402 (the "Yale Residence"), and its curtilage. (*See* Doc. No. 21-3 at PageID 92.) Although Matthews' primary residence is 121 Valley View Drive (the "Valley View Residence"), not the Yale Residence, law enforcement observed Matthews

frequent the Yale Residence on several occasions, as further detailed below.[1] (*See id*. at PageID 95.) The affiant who authored the affidavit in support of Search Warrant 1 is Detective Cody P. Hartings ("Detective Hartings") with the Dayton Police Department. (*See id*. PageID 94–97.) The second search warrant ("Search Warrant 2") authorized the search of four cellphones found on either Matthews' person or in his vehicle during a traffic stop and consequent search in anticipation of the Yale Residence search. (Doc. No. 21-4 at PageID 80.) Likewise, Detective Hartings served as the affiant for Search Warrant 2. (*See id*. at PageID 82–85.)

During their execution of Search Warrant 1, officers located suspected drugs, money, and a handgun. (Doc. No. 21-3 at PageID 90.) Shortly after the searching officers initiated their search of the Yale Residence, two nearby surveilling officers from the Dayton Police Department—Officer Eli Moreland ("Officer Moreland") and Officer Sean Gallagher ("Officer Gallagher")—observed Matthews driving near the Yale Residence, so they conducted a traffic stop. (*See* Doc. No. 21-4 at PageID 85.) Officers Moreland and Gallagher thereafter performed a *Terry* frisk of Matthews, which revealed Matthews had two cellphones on his person. (Gov't. Ex. 5, Moreland Body Cam Footage, at 1:56–2:57.) Matthews was subsequently detained and placed in the back of Officer Moreland's cruiser without handcuffs. (*Id*. at 3:07.) After detaining Matthews, Officer Gallagher walked his canine around Matthews' vehicle, and the canine alerted to the scent of narcotics. (Gov't. Ex. 6, Gallagher Body Cam Footage, at 4:39–5:10.) Officers Moreland and Gallagher then conducted a thorough search of Matthews' vehicle and located two more cellphones. (Gov't. Ex. 5, Moreland Body Cam Footage, at 7:01–17:20.) Law enforcement subsequently sought a search warrant for the electronic data in the phones, which was granted.

[1] Per the Government's Response, "[a]nything that was found in a search of [the Valley View Residence] was not charged as a part of this case and will not be offered into evidence as part of the Government's case-in-chief." (Doc. No. 24 at PageID 109 n. 2.)

(Doc. No. 21-4 at PageID 82–86.)

As mentioned, Matthews seeks the suppression of all evidence gleaned from the execution of both Search Warrant 1 and Search Warrant 2 (collectively, the "Search Warrants"). (Doc. No. 17 at PageID 41.) Because Matthews' request for suppression hinges entirely on the supposed absence of probable cause in the Search Warrants, the Court finds it prudent to include the exact language contained in the accompanying affidavits.[2] The relevant portions of the Search Warrant 1 affidavit are as follows:

> In February of 2025, Detective Vincent J. Carter and I, Detective Cody P. Hartings received information from a reliable and confidential informant (CI) that Travis Matthews was selling large quantities of illegal narcotics. The CI stated that Matthews had pounds of illegal drugs. The CI has provided information in the past that has proven true and accurate through independent investigation and led to the issuance of search warrants that have resulted in drugs, guns and money being recovered.
>
> I conducted a search using the Dayton Management Information System. I learned that Matthews was arrested on February 11, 2025, while trying to flee from the Dayton Police Department. Matthews was found to be in possession of a handgun and a large amount of United States currency, Dayton Police report 2502110003.
>
> I reviewed jail phone calls that Matthews made while being in the Montgomery County Jail. Matthews called a female listed in the jail call as Chanel Repasky with an address of 650 Yale Avenue.
>
> I conducted a search in the Ohio Law Enforcement Gateway website (OHLEG) for Travis Matthews. I found that he has an address of 121 Valley View Drive listed on his Ohio driver's license. I found that Matthews has a gray Dodge pickup truck registered with an Ohio registration KJT8108. The vehicle is registered to the address of 121 Valley View Drive.
>
> I conducted a search using the Montgomery County Auditors website. I searched the address of 121 Valley View Drive and learned that it was owned by Travis Matthews.
>
> I conducted a search using the Montgomery County Justiceweb website. I searched the name Travis Matthews. I found that Travis had a drug possession conviction

[2] The Parties jointly filed a Stipulation of Facts, which are not in dispute. (*See generally* Doc. No. 21.) Appended to their Stipulation are Search Warrant 1, Search Warrant 2, and their respective affidavits, which the Court here references for its factual basis. (*See* Doc. Nos. 21-3 at PageID 94–97; 21-4 at PageID 82–85.)

through the Montgomery County Common Pleas Court, case number 2015CR01157. I found he had another drug conviction through the Montgomery County Common Pleas Court, case number 2013CR02917. Matthews had a trafficking in drugs conviction out of the Butler County Common Pleas Court, case number 2009CR00855.

On February 18, 2025, I conducted surveillance at 650 Yale Avenue in the early morning hours. I observed a gray Dodge Ram pick-up truck with an Ohio registration, KJT8108 parked in the driveway of the residence.

On February 20, 2025, I conducted surveillance at 650 Yale Avenue. I observed Matthews sitting in the driver seat of a gray Dodge Ram pick-up truck with an Ohio registration, KJT8108. The vehicle was backed into the driveway of 650 Yale Avenue. Matthews sat in the driver seat for over an hour without ever leaving.

On February 26, 2025, I conducted surveillance at 650 Yale Avenue. I observed Matthews exit the residence and get into the driver seat of the gray Dodge Ram pickup truck and leave the residence. Later in the afternoon, I conducted surveillance at 121 Valleyview Drive. I observed Matthews back the Dodge ram pickup truck into the driveway of the residence. Matthews exited the driver seat and entered the front door of the residence.

On March 3, 2025, Detective Caleb D. Lawson and I conducted a trash pull at 121 Valleyview Drive. The city trash cans were on the street in front of the residence in the public right of way, for the scheduled trash collection day as verified on the City of Dayton website. Detective Lawson and I collected two trash bags from the trash can. I sorted through the trash bags and located three cellophane plastic baggies. I also located a mortgage bill for the name of Travis Matthews and the address of 121 Valleyview Drive.

I tagged the cellophane baggies into the Dayton Police Department Property Room. A Hamilton County Crime Laboratory Evidence Submission Form was completed.

While conducting the trash pull, I observed that the gray Dodge Ram pickup truck that I have seen Matthews drive, parked in the driveway of 121 Valleyview Drive. I later received the lab report back from the trash pull. One of the baggies tested positive for cocaine.

On March 4, 2025, I conducted surveillance at 650 Yale Avenue. I observed Matthews exit the residence and get into the driver’s seat of a gray Dodge Ram with an Ohio license plate KJT8108. I followed Matthews to conduct further surveillance on him. Matthews drove straight from 650 Yale Avenue to 121 Valleyview Drive. Matthews backed into the driveway and entered the front door of the residence.

On April 21, 2025, Detective Caleb D. Lawson, John W. Rice, and I conducted a

trash pull at 650 Yale Avenue. The city trash cans were in the alley behind the residence in the public right of way, for the scheduled trash collection day as verified on the City of Dayton website. Detective Lawson and Detective Rice collected two trash bags from the trash can. Detective Lawson and I sorted through the trash bags. We located four cellophane plastic baggies. One baggie had a large amount of a white powdery residue. Through our training and experience we know that illegal narcotics are often sold and packaged in these types of baggies. I field tested the white powdery substance and it came back with a presumptive positive alert for cocaine. I tagged the baggies into the Dayton Police Department Property Room. A Hamilton County Crime Laboratory Evidence Submission Form was completed.

I later received the lab report back. The residue tested from the baggies was a combination of heroin, cocaine, fentanyl, methamphetamine, xylazine, medetomidine, and delta -9- tetrahydrocannabinol.

While conducting the trash pull, I observed Matthews' Dodge Ram truck parked in the driveway of the residence.

On April 28, 2025, Detective Kenneth E. Webster and I, conducted a trash pull at 121 Valley View Drive. The city trash can was on the street in front of the residence in the public right away, for the scheduled trash collection day as verified on the City of Dayton website. Detective Webster and I collected two trash bags from the trash can. In one trash bag I located a NFCR .40 S&W bullet. In the other trash bag, I located a cellophane baggie and a black zip loc baggie. The black zip loc baggie had marijuana residue inside. I tagged the baggies into the Dayton Police Department Property Room. A Hamilton County Crime Laboratory Evidence Submission Form was completed. I later received the laboratory results back. The results came back as delta-9- tetrahydrocannabinol. It should be noted that due to Matthews' criminal history he is prohibited from owning firearms.

On May 5, 2025, Detective John Rice and I conducted a trash pull at 650 Yale Avenue. The city trash can was in the alley behind the residence in the public right away [sic], for the scheduled trash collection day as verified on the City of Dayton website. We collected two trash bags from the trash can. In one trash bag I located three cellophane plastic baggies. The baggies were ripped on the corners. Through our training and experience we know that drug traffickers will package drugs using cellophane baggies. Often times dealers will package the drugs and rip the corner away from the bag while tying it in a knot. The dealer will then sell the knotted-up corner to a drug user. I tagged the baggies into the Dayton Police Department Property Room. A Hamilton County Crime Laboratory Evidence Submission Form was completed. I later received the laboratory results back. The baggies tested positive for cocaine.

On July 7, 2025, Detective Caleb Lawson, Detective Rice, and I conducted a trash pull at 650 Yale Avenue. The city of Dayton trash can was in the alley behind the

> residence in the public right away [sic], for the scheduled trash collection day as verified on the City of Dayton Website. Detective Lawson and Rice collected two bags from the trash bag. Detective Rice and I sorted through the trash bags. In both trash bags multiple cellophane baggies were located. A couple of the baggies were ripped on the corner. Through our training and experience we know that drug traffickers will package drugs using cellophane baggies. Often times dealers will package the drugs and rip the corner away from the bag while tying it in a knot. The dealer will then sell the knotted-up corner to a drug user. A couple other baggies had a white powdery substance inside. I field tested the white powdery substance and it came back with a presumptive positive alert for cocaine.
>
> While conducting the trash pull, I observed Matthews' Dodge pickup truck parked in the driveway of the residence.
>
> On July 8, 2025, I went to conduct surveillance at 650 Yale Avenue. Prior to getting to the location, I observed Matthews in the driver seat of the Dodge Ram truck stopped at the stop light at the intersection of Rosedale Avenue and West Riverview Avenue.

(Doc. No. 21-3 at PageID 94–97.) The facts contained in the affidavit for Search Warrant 2 are largely repetitive of those in Search Warrant 1, save the following two paragraphs:

> On July 14, 2025, at 8:17 A.M. the Honorable Judge Christopher D. Roberts of the Dayton Municipal Court signed a search warrant for 650 Yale Avenue. The search warrant was served on July 15, 2025, at approximately 9:02 A.M. During the search [] a large amount of cocaine, a handgun, and money were recovered. A traffic stop was conducted on Matthews, and he was in possession of four cellphones as further described in paragraph III of the Search Warrant.
>
> I have learned through experience in drug related cases that cellular phones are often used to facilitate drug sales. Cellular phones are also used to store numbers of drug buyers and sellers, contain voice and text messages related to drug sales, contain photographs and videos of drug related activities and contain evidence to drug sales operations such as drugs, weapons and money.

(Doc. No. 21-4 at PageID 85.)

On May 8, 2026, Matthews filed his Motion, which seeks to suppress all evidence and statements gleaned from the execution of both Search Warrants. (*See generally* Doc. No. 17.) Matthews thereafter filed his Brief in Support of his Motion on July 13, 2026. (*See* Doc. No. 23.) The Government responded (Doc. No. 24) on August 3, 2026, and Matthews

replied (Doc. No. 25) on August 13, 2026. Consequently, the instant matter is ripe for review and decision.

## II. LEGAL STANDARD

A criminal defendant may seek the suppression of evidence by filing a pretrial motion with the Court. FED. R. CRIM. P. 12(b)(3)(C). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003). When a party seeks to challenge an allegedly unconstitutional search, the Fourth Amendment governs. *See Colson v. City of Alcoa*, 37 F.4th 1182, 1186 (6th Cir. 2022). At bottom, the Fourth Amendment of the Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV. Under the Fourth Amendment, law enforcement may generally not conduct a search before obtaining "a warrant from a neutral and disinterested magistrate." *Franks v. Delaware*, 438 U.S. 154, 164 (1978). To this end, it is expected that a magistrate will not issue a search warrant without a showing of probable cause to justify the requested search. *United States v. Abboud*, 438 F.3d 554, 569 (6th Cir. 2006) ("Only if the magistrate finds probable cause can she issue a search warrant"). Altogether, the Fourth Amendment protects against unreasonable searches and seizures by "requiring that [the usual inferences which reasonable men draw from evidence] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Illinois v. Gates*, 462 U.S. 213, 240 (1983) (quoting *Johnson v. United States*, 333 U.S. 10, 13-14 (1948) (alterations in original).

When applying for a search warrant, the government necessarily bears the burden of establishing probable cause. *Abboud*, 438 F.3d at 569 (citing FED. R. CRIM. P. 41(c); *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996)). To meet its burden, the government is expected to offer an affidavit containing "facts that indicate 'a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (quoting *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005)). The government need not possess evidence that would secure a conviction beyond a reasonable doubt. *Wong Sun v. U.S.*, 371 U.S. 471, 479 (1963). Rather, "probable cause is a fluid concept" inherently tied to "an assessment of probabilities" and based on variable and particularized facts. *Gates*, 462 U.S. at 231.

Magistrate judges reviewing an affidavit for probable cause must draw from the totality of the circumstances presented in the government's affidavit. *See id.*; *see also Wong Sun*, 371 U.S. at 479 (Probable cause "must be measured by the facts of the particular case."). By the totality of the circumstances, a magistrate's probable cause determination will generally stand when she had a substantial basis for concluding that the search would turn up evidence of criminality. *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). In the end, whatever lies within the four corners of the government's affidavit will dictate whether a magistrate had a substantial basis for her probable cause determination. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (citing *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003)). Moreover, a magistrate judge's probable cause determination should most often "be paid great deference." *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

With certain exceptions, any evidence obtained as a result of an unlawful search cannot be used as evidence against the victim of the search. *Wong Sun*, 371 U.S. at 484 (citing *Weeks v.*

*United States*, 232 U.S. 383 (1914)). One such exception to the exclusionary rule is the good-faith reliance exception. *See United States v. Leon*, 468 U.S. 897, 905 (1984). "Though evidence obtained in violation of the Fourth Amendment is generally excluded, the Supreme Court has held that the exclusionary rule 'should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" *Frazier*, 423 F.3d at 533 (quoting *Leon*, 468 U.S. at 905). In assessing whether an officer's reliance meets this exception, the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n. 3. In so doing, courts are to consider "all of the circumstances" surrounding the search warrant application. *Id.*

## III. ANALYSIS

At their core, Matthews' arguments in favor of suppression can be condensed into two overarching contentions. First, Matthews argues the signatory judge lacked a substantial basis to make probable cause findings in order to issue both Search Warrants based on the affidavits provided. (Doc. No. 23 at PageID 99–105.) Second, Matthews believes that, even if the Search Warrants had been supported by probable cause, the good-faith reliance exception does not apply. (*Id.* at PageID 105–06.) The Court takes up each Search Warrant in turn.

### A. Search Warrant 1

As briefly mentioned above, the Government indicates it has not pursued any charges relating to the search of the Valley View Residence—Matthews' primary residence—in its case-in-chief, nor does it proffer any evidence obtained from the Valley View Residence search in its papers. (*See* Doc. No. 24 at PageID 109 n. 2.) Instead, the Government's indictment rests largely on the evidence derived from the search of the Yale residence, which the Parties agree Matthews was associated with but not where he resided. (*See* Doc. No. 21 at PageID 69.) Thus, as a

preliminary matter, the Court addresses whether Matthews' privacy interest, if any, in the Yale Residence sufficiently confers standing to allow him to seek suppression of the evidence located therein.

**i. Standing**

Generally speaking, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969) Thus, "in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.,* one that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (quoting *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12 (1978)). The subject of a search warrant need not be the defendant's "'home,' temporary or otherwise, in order for him to enjoy a reasonable expectation of privacy there[,]" for the "Fourth Amendment protects people, not places and provides sanctuary for citizens wherever they have a legitimate expectation of privacy." *Minnesota v. Olson*, 495 U.S. 91, 96 n. 5 (1990) (internal citations and quotation marks omitted). Simply put, "when a person objects to the search of a place and invokes the exclusionary rule, he or she must have the requisite connection to that place." *Id*. at 99 (Kennedy, J., concurring). For the exclusionary rule to apply, "[a] defendant must satisfy a two-pronged test to show a legitimate expectation of privacy: 1) he must manifest an actual, subjective expectation of privacy; and 2) that expectation is one that society is prepared to recognize as legitimate." *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000).

The rules regarding the privacy rights of overnight guests are relatively settled. *See generally Olson*, 495 U.S. 91. But while "[a] person—whether social guest or renter—has a

reasonable expectation of privacy in the place where he sleeps at night[,]" the same cannot always be said for more ephemeral invitees. *United States v. Allen*, 720 F. App'x 254, 257 (6th Cir. 2018). For instance, "one who is merely present with the consent of the householder may not" claim the protections of the Fourth Amendment. *Carter*, 525 U.S. at 90. "This is particularly true where . . . the person seeking the protections of the Fourth Amendment was on the premises for the sole purpose of engaging in drug-related business transactions." *United States v. Harris*, 255 F.3d 288, 295 (6th Cir. 2001). "To otherwise have a reasonable expectation of privacy as a guest at another person's residence, a defendant must 'establish that he has a meaningful connection to the residence.'" *United States v. Carney*, No. 24-6051, 2026 WL 813847, at *5 (6th Cir. Mar. 24, 2026) (quoting *United States v. Haynes*, 108 F. App'x 372, 374 (6th Cir. 2004)). "Evidence of such a connection includes that the defendant was staying at the residence recently, occasionally stayed overnight, kept personal items there, had a relationship with the residents, or could stay there even when other residents were gone." *United States v. James*, No. 3:24-CR-87, 2026 WL 2364238, at *11 (E.D. Tenn. Aug. 14, 2026); *see also United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) ("[I]mportant factors to be considered in determining whether there was a legitimate expectation of privacy include ownership, lawful possession, or lawful control of the premises searched.").

Much to the Court's chagrin, the Parties do not squarely address the issue of standing in this case, even though neither side seems to dispute that Matthews did not reside at the Yale Residence but rather was merely "attributed" to it. (*See* Doc. No. 21 at PageID 59, 61; Doc. No. 21-3 at PageID 95.) Although Matthews makes short shrift of his purportedly attenuated connection with the Yale Residence, he does so to advance his argument that "[a]n individual's mere presence at a residence does not establish a nexus and thereby probable cause to search the

home." (Doc. No. 23 at PageID 101.) It is nevertheless the Court's responsibility, as a threshold matter, to determine whether Matthews has standing to invoke the exclusionary rule as to the search of the Yale Residence. *See United States v. Ellis*, 125 F. App'x 691, 695 (6th Cir. 2005).

Here, Detective Hartings' preliminary background check of Matthews revealed that the Valley View Residence was listed on Matthews' driver's license; Matthews was the owner of record of the Valley View Residence according to the Montgomery County Auditor's website; Matthews' truck was registered to the Valley View Residence; and, while conducting a trash pull, Detective Hartings located a mortgage bill for the Valley View Residence that was addressed to Matthews. (Doc. No. 21-3 at PageID 95.) In sum, all roads led to the conclusion that the Valley View residence is where Matthews permanently resided. Setting aside law enforcement's surveillance efforts, Matthews' only initially apparent connection to the Yale Residence—at least, on paper—included a phone call Matthews made to a woman named Chanel Repasky at the Yale Residence while he was in jail for a previous and unrelated charge in February of 2025. (*Id.*) Indeed, shortly after Matthews' detention during the traffic stop, Officer Moreland shared the following conversation with Matthews regarding his relationship with the Yale Residence:

> Officer Moreland: "So, you are detained for a search warrant. Okay?"
>
> Matthews: "What?"
>
> Officer Moreland: "At your house, a search warrant at your house. Is there anyone inside the home or big, mean dogs? It's very important that you tell me that because if you lie to me and then somebody gets hurt, that looks really bad on you, right? So, is there anybody else inside your home? Kids? Girlfriends? Buddies?"
>
> Matthews: "My home?"
>
> Officer Moreland: "Yes, 650 Yale."
>
> Matthews: "I don't live at 650 Yale. I'm just dog sitting."

> Officer Moreland: "Okay, that's where you just came from, and we've got photos of you for months."

(Gov't. Ex. 5, Moreland Body Cam Footage, at 4:07–4:47.) Thus, as is evident from Detective Hartings' pre-search, preliminary investigation and Officer Moreland's questioning during Matthews' detention, Matthews does not reside at the Yale Residence.

Still, that Matthews' primary home is not the Yale Residence does not necessarily mean he does not enjoy certain privacy interests related to it. Instead, Matthews' standing here will turn on whether his connections to the Yale Residence are sufficient to justify a finding that he has a reasonable expectation of privacy in it. Although a Section 1983 case, one case out of the Fourth Circuit is particularly germane because it analyzes the issue of standing to assert one's Fourth Amendment rights in the context of a non-overnight guest. *See generally Bonner v. Anderson*, 81 F.3d 472 (4th Cir. 1996). In *Bonner*, the plaintiff was injured at the hands of law enforcement during the execution of a search warrant of a home she frequented but not one where she was an overnight guest. *Id*. at 475. There, the Fourth Circuit found that the plaintiff's connections to the property sufficiently conferred her standing under the Fourth Amendment:

> Bonner was not an overnight guest. Nevertheless, the principles that guided *Olson* are applicable to her. Bonner was a frequent visitor at the Mealey residence. Her half-sister had been raised there, and she previously lived in a neighboring building on the property. She often ran errands for Ms. Mealey, whom everyone called "Grandma," and she was in the house for this purpose when she was injured. We believe that Bonner's activities—visiting a neighbor and assisting the elderly—establish an expectation of privacy that is "recognized and permitted by society."

*Id*. (quoting *Olson*, 495 U.S. at 100).

Here, once again, it is undisputed that Matthews does not reside at the Yale Residence. And although unaddressed by the Parties, the Court was able to glean the following connections based on a review of the record. First, just after stopping and questioning Matthews, Officer Moreland indicated that law enforcement had just observed Matthews leaving the Yale Residence.

(Gov't. Ex. 5, Moreland Body Cam Footage, at 4:44–4:55.) Matthews explained that the reason for his departure from the Yale Residence was because he was "dog sitting" there. (*Id*. at 4:41.) Apart from a dog, Matthews informed Officer Moreland that no one was home, indicating that Matthews was permitted entry while no one else was present. (*Id*. at 4:55.) Shortly after Officer Moreland detained Matthews, other officers initiated a search of the Yale Residence. And while Matthews was sitting in the back of the police cruiser, Officer Moreland asked if Matthews had any family members who could take his animals, referring to the dog found by officers contemporaneously searching the Yale Residence. (*Id*. at 44:57–45:00.) Matthews indicated that his "girl" could look after the dog and gave Officer Moreland her contact information. (*Id*. at 45:00–45:58.) Matthews further provided his girlfriend's name is Chanel. (*Id*.) Presumably, Chanel is the same individual listed in Detective Harting's affidavit, whose address is listed as the Yale Residence and who Matthews made a jail call to during a previous arrest. (Doc. No. 21-3 at PageID 95.) And not including the day of Matthews' arrest, Detective Hartings observed Matthews either arriving at or departing from the Yale Residence at least seven times. (*Id*. at PageDI 95–97.) In sum, while the record is devoid of any indication that Matthews was ever an overnight guest at the Yale Residence, it is clear that he was dog sitting there, his girlfriend lived there, and he frequented the property on numerous occasions, sometimes even when his girlfriend was not there.

Thus, the Court finds that Matthews' connections with the Yale Residence are substantial enough to confer him a reasonable expectation of privacy in the Yale Residence, thereby vesting him with standing to dispute the efficacy of its search. Next, the Court turns to whether the judge had a substantial basis for his probable cause finding in issuing Search Warrant 1.

**ii. Probable Cause Determination**

For his part, Matthews contends the Search Warrant 1 affidavit "fail[s] to establish a sufficient nexus between any alleged criminal activity and the [Yale Residence]." (Doc. No. 23 at PageID 100–01.) More precisely, Matthews maintains that the Confidential Informant's ("CI") tip that Matthews possessed "pounds of illegal drugs" falls short of the probable cause standard because the CI did not explain how they knew that information, did not identify the Yale Residence specifically, and provided no information that could lead law enforcement to connect the drug activity to the Yale Residence. (*Id.* at PageID 101.) True, when law enforcement receives information from an informant, officers ought not rely solely on the tip but should instead independently corroborate the information provided. *See United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) ("Probable cause may come from a confidential informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers."). Be that as it may, that is precisely what Detective Hartings did here. Not including the day of his arrest, Matthews and/or his vehicle were observed at the Yale Residence at least seven times. (Doc No. 21-3 at PageID 95–97.) Twice Matthews was seen parked at the Yale Residence during Detective Hartings' surveillance efforts; Matthews' vehicle was observed parked at the Yale Residence during two separate trash pulls; twice Detective Hartings observed Matthews leave the Yale Residence and drive to the Valley View Residence; and finally, on the day of Matthews' arrest, officers had knowledge that Matthews had just left the Yale Residence before conducting a traffic stop nearby. (*Id.*) In fact, law enforcement only learned of Matthews' connections to the Yale Residence based on their surveillance of him because the CI only provided information pertaining to Matthews, not the Yale Residence. (*Id.* at PageID 95.) It was through their

independent corroboration that officers were able to discover the nexus between Matthews and the Yale Residence.

In a similar vein, Matthews finds it problematic that law enforcement never performed any controlled purchases at the Yale Residence. (Doc. No. 23 at PageID 102.) But this argument completely disregards the well-established rule that "[l]aw enforcement need not always conduct a controlled buy to establish probable cause." *United States v. Ward*, No. 25-5702, 2026 WL 2076005, at *3 (6th Cir. July 17, 2026). As the Government points out, an "affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000). And the Court here is of the opinion that the affidavit's contents sufficiently establish a nexus between Matthews and the Yale Residence.

Next, Matthews takes issue with the "staleness" of the evidence gleaned from the various trash pulls. (Doc. No. 23 at PageID 101, 104.) This argument is rather puzzling, especially considering Detective Hartings conducted a trash pull at the Yale Residence while Matthews' truck was parked in the driveway a mere week before Matthews' arrest, whereupon he located baggies that field tested positive for cocaine. (Doc. No. 21-3 at PageID 91, 96–97.) Perhaps had Detective Hartings relied solely on one trash pull conducted several months prior to Matthews' arrest, Matthews' staleness argument would be more availing. But Detective Hartings conducted a total of five trash pulls—three at the Yale Residence and two at the Valley View Residence—all of which yielded baggies that tested positive for drugs, either by laboratory test or field test. (*Id.* at PageID 95–97.) That said, the evidence obtained as a result of the trash pulls was not stale.

Based on the foregoing, the signatory judge had a substantial basis for his probable cause finding for Search Warrant 1.[3]

**B. Search Warrant 2**

Next, the Court turns to Matthews' qualms with Search Warrant 2. As delineated above, all but the last few paragraphs in Search Warrant 2 contain the exact facts listed in Search Warrant 1. (*Compare* Doc. No. 21-3 at PageID 94–97, *with* Doc. No. 21-4 at PageID 82–85.) But contrastingly, Search Warrant 2 authorized a search of the electronic data of the four cellphones located in either Matthews' vehicle or on his person during his detention. (Doc. No. 21-4 at PageID 80–81.) From what the Court can gather, Matthews raises two arguments regarding the insufficiency of Search Warrant 2. First, he maintains that, as with Search Warrant 1, Search Warrant 2 established an inadequate nexus between the suspected criminal activity and the phones. (Doc. No. 23 at PageID 104.) Second, because the phones were seized during the execution of the purportedly inadequate Search Warrant 1 and because Search Warrant 2 improperly "bootstraps" the language contained in Search Warrant 1, the data collected from the phones should be suppressed as fruit of the poisonous tree. (*Id.* at PageID 101.) Before addressing Matthews' arguments in favor of suppression, the Court finds it prudent to address the propriety of the initial traffic stop because the phones at issue were seized during the traffic stop.

[3] Matthews' Motion also raises alternative arguments as to both Search Warrant 1 and Search Warrant 2: "The good-faith exception cannot salvage these warrants." (Doc. No. 23 at PageID 105–06.) However, having found that the signatory judge possessed a substantial basis for his probable cause determination, the Court need not delve into Matthews' *Leon* good-faith reliance argument. *See United States v. Frechette*, 583 F.3d 374, 381 (6th Cir. 2009) ("There is no need to go into a lengthy analysis of whether the agents relied on the search warrant in good faith because the magistrate judge had a substantial basis for finding probable cause."). For the same reason, the Court does not reach the good-faith reliance exception in the section designated for Search Warrant 2.

**i. Propriety of the Traffic Stop and Initial Detention**

Once again, the Parties' papers are relatively quiet on this topic.[4] Generally speaking, "an officer needs either probable cause or reasonable suspicion to conduct a traffic stop." *Campbell v. Mack*, 777 F. App'x 122, 132 (6th Cir. 2019). While mere reasonable suspicion—as is typically present during traditional traffic stops—is a less onerous burden than probable cause, law enforcement nevertheless needs some "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *see also Harris v. Langley*, 647 F. App'x 585, 591 (6th Cir. 2016) ("[W]here there has been a limited intrusion on a person's liberty but no formal arrest, that intrusion may be justified by something less than probable cause."). Neither Party here disputes that Officer Moreland only pulled Matthews over "in anticipation of executing a search warrant" of the Yale Residence. (Doc. No. 21 at PageID 59.) Matthews' Motion briefly addresses the adequacy of the initial stop: "Even though officers did not see [] Matthews commit any traffic violations, they stopped him 'in anticipation of executing [the] search warrant at [the Yale Residence.]'" (Doc. No. 23 at PageID 100 (second alteration in original) (quoting Doc. No. 21 at PageID 59).) The Government, meanwhile, adamantly maintains that "the search warrant for [the Yale Residence] also authorized a search of the person of [] Matthews. Therefore, officers were able to stop the pickup truck" absent any traffic violation. (Doc. No. 24 at PageID 124 n. 4.) But the Government's representation misstates both binding caselaw and the contents of Search Warrant 1. *See Perez*, 629 F. App'x at 704 n. 3 ("Search warrants are not directed at persons; they authorize the search of 'place[s]' and the seizure of 'things' and persons. The search warrant here originally gave police probable cause

[4] District courts are authorized to construe additional grounds for suppression even if not raised or perfunctorily raised by the parties. *See United States v. Perez*, 629 F. App'x 699, 701 (6th Cir. 2015) (affirming the district court's ruling where it "construed three additional grounds" for suppression).

to search a place—211 Glenwood Avenue—for a list of things, as well as a person known only as 'Scar.'" (alteration in original) (internal quotation marks and citation omitted)).

In the section dedicated to enumerating the locations to be searched, Search Warrant 1 merely lists the address of the Yale Residence, nothing else. (Doc. No. 21-3 at PageID 92.) And just after listing the sought items, such as drugs, that law enforcement anticipated finding at the Yale Residence, Search Warrant 1 posits that said items could be found on either Matthews' person or at the Yale Residence. (*Id.*) It is as if Search Warrant 1 presupposes that Matthews would be located at the Yale Residence upon its execution and therefore subject to search. *See Perez*, 629 F. App'x at 704 n. 3. What's more, although Officer Moreland informs Matthews that he somehow knew Matthews left the Yale Residence just before his detention, the record is otherwise devoid of any mention that Matthews was either at or had just left the Yale Residence. (*See* Gov't. Ex. 5, Moreland Body Cam Footage, at 4:38–4:55 (Officer Moreland: "Yes, 650 Yale . . . . That's where you just came from."); *see also* Doc. No. 21-4 at PageID 85 (While other officers initiated their search of the Yale Residence, "[a] traffic stop was conducted [by Officer Moreland] on Matthews, and [Matthews] was in possession of all four cell phones . . . .").) In fact, if one looks closely at the dash camera footage and maps of the detention location, it is not quite so apparent that Matthews "just came from" the Yale Residence:[5]

[5] The Court takes judicial notice of Google Maps of the locations at issue. *See Mitchell v. Tennessee Valley Auth.*, No. 3:14-CV-360, 2015 WL 1962203, at *1 n.1 (E.D. Tenn. Apr. 30, 2015) ("The Court may take judicial notice of Google Maps to determine distances and locations."); *see also* FED. R. EVID. 201(b)(1)–(2) ("The Court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").




Officer Moreland first laid eyes on Matthews driving in his truck along Kumler Avenue when they both stopped at stop signs perpendicular to one another at the intersection of Kumler Avenue and Oxford Avenue (the black "X" in the diagram above), which is approximately .3 miles away from the Yale Residence. (*See* Gov't. Ex. 7, Moreland Dash Cam Footage, at 00:27.) After turning onto Kumler Avenue and tailing Matthews for a block or so, Officer Moreland activated his lights and sirens at the intersection of Kumler Avenue and Lexington Avenue. (*Id.* at 00:27–00:58.) Matthews immediately pulled over at that intersection (the red "X" in the diagram above), which

is approximately .4 miles away from the Yale Residence. (*Id.* at 1:03.) Thus, the question here is whether, absent any traffic violation, law enforcement was justified in pulling over Matthews—who happened to be driving near but was not at the Yale Residence—pursuant to Search Warrant 1, which merely authorized a search of the Yale Residence and further indicated contraband may be found on Matthews' person.

Fortunately for this Court, the Supreme Court had cause to answer this very question in *Bailey v. United States*, whose facts are remarkably similar to those in the case at bar. *See generally* 568 U.S. 186 (2013). In *Bailey*, the relevant facts are as follows. Like the present case, law enforcement obtained a search warrant to search a residence. *Id.* at 190. "As the search unit began preparations for executing the warrant, two officers . . . were conducting surveillance in an unmarked car outside the residence." *Id.* The surveilling officers observed the defendant leave the driveway of the subject residence and followed the defendant "for about a mile" before conducting a traffic stop. *Id.* After patting down the car's occupants and locating keys on the defendant's person, the officers informed the defendant that he was "being detained incident to the execution of a search warrant" at the subject residence. *Id.* at 190–91. During his detention, the defendant made statements denouncing any relationship to the residence. *Id.* The surveilling officers then seized keys from the defendant's person and met the searching officers at the residence. *Id.* at 191. Although the search team had already entered the residence, pursuant to a valid search warrant, and discovered contraband upon the surveilling officers' arrival, the surveilling officers later used the keys found on the defendant's person to open the residence door. *Id.*

The defendant there moved to suppress the keys found on his person and all statements he made during his detention, arguing the traffic stop was an unreasonable seizure because the surveilling officers observed no traffic violations and only had a search warrant for the residence.

*Id*. The issue presented was "whether the seizure of a person was reasonable when he was stopped and detained at some distance away from the premises to be searched when the only justification for the detention was to ensure the safety and efficacy of the search." *Id*. at 189–90. The Supreme Court held that "[o]nce an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe[;]" therefore, "the decision to detain must be acted upon at the scene of the search and not at a later time in a more remote place." *Id*. at 201–02. The Court reasoned that because the defendant "was detained beyond any reasonable understanding of the *immediate vicinity* of the premises in question[,]" the traffic stop and resulting detention could not possibly be authorized by the residential search warrant. *Id*. at 201 (emphasis added). Importantly, the Court's holding was a relatively narrow one—while the search warrant was insufficient to justify the stop and detention, the Court left open the possibility that other grounds may fill the gap. The Court further provided guidance for cases where the unreasonableness of a stop may be less apparent:

> In closer cases courts can consider a number of factors to determine whether an occupant was detained within the immediate vicinity of the premises to be searched, including the lawful limits of the premises, whether the occupant was within the line of sight of his dwelling, the ease of reentry from the occupant's location, and other relevant factors.

*Id*.; *see also Harris*, 647 F. App'x at 592 ("The Court also tallied the following justifications for such intrusions: preventing flight, minimizing the risk of harm to the officers, a suspicion of wrongdoing regarding the detained [person], and promoting the orderly completion of the search."). Based on the foregoing, the Court ultimately reversed the lower courts' denial of the defendant's motion to vacate his conviction. *Bailey*, 568 U.S. at 202. Thus, it is incumbent on this

Court to assess the reasonableness of the traffic stop and Matthews' initial detention in light of the above factors.

As mentioned, Officer Moreland first observed Matthews driving his truck about .3 miles away from the Yale Residence and, after following Matthews for about a block, detained him approximately .4 miles away from the Yale Residence. (*See* Gov't. Ex. 7, Moreland Dash Cam Footage, at 00:27–00:58.) As is evident from the diagram above, neither of those locations was within the immediate vicinity of the Yale Residence. While relatively close to the Yale Residence, neither Officer Moreland's initial point of observation, nor Matthews' site of detention was within the line of site of the Yale Residence. Nor would it have been feasible for Matthews to reenter the Yale Residence from the site of his detention. In fact, Matthews' direction of travel seems to indicate he was driving away from, not toward, the Yale Residence. At first glance, it seems, law enforcement's initial stop of Matthews may have been unreasonable given that he was undoubtedly not in the "immediate vicinity" of the Yale Residence.

However, crucial developments following the Supreme Court's *Bailey* ruling compel this Court to conclude otherwise. *See United States v. Bailey*, 743 F.3d 322 (2d Cir. 2014), *cert. denied* 574 U.S. 1038 (2014). Upon remand, the Second Circuit was tasked with analyzing an issue left unanswered by the Supreme Court—that is, whether "*Terry's* investigatory stop rule might provide an independent basis for detention." *Id.* at 326. In other words, even if no reasonable suspicion of criminal activity exists to sufficiently justify a traffic stop, is law enforcement nevertheless independently authorized to conduct a traffic stop and detain a defendant in the name of *Terry's* limited conferral? *Id.* The Second Circuit answered that question in the affirmative. *Id.* ("[T]his court now concludes *Terry v. Ohio* independently supported Bailey's initial detention and patdown . . . ."). There, the court reasoned that because *Terry* stops extend not only to detentions

in anticipation of a crime, but also to circumstances where law enforcement has a reason to believe the detainee has already committed a criminal offense, the defendant's detention was authorized under *Terry*. *Id*. at 332 (citing *Arizona v. Johnson*, 555 U.S. 323, 326 (2009)). Given that the officers had observed the defendant leave the subject residence and had ample other evidence to support his involvement in a drug trafficking operation, the defendant's "initial stop and patdown were supported by multiple articulable facts giving rise to a reasonable suspicion that he had been and was then engaged in criminal activity and might be armed." *Id*. at 332–33. Indeed, the Sixth Circuit has adopted the rule that, even if no traffic violations were observed, *Terry* may nevertheless justify a stop in certain circumstances. *See, e.g.*, *United States v. Sheckles*, 996 F.3d 330 (6th Cir. 2021). The same logic applies in the case at bar.

Here, law enforcement observed Matthews at the Yale Residence at least seven times. (*See* Doc No. 21-3 at PageID 95–97.) Five trash pulls, three of which were conducted at the Yale Residence, revealed drugs were located at the respective residences. (*Id.*) While the affidavits do not conclusively indicate that Matthews had just left the Yale Residence, he was only a few blocks away when stopped, and importantly, Matthews stipulated to the authenticity of Officer Moreland's body camera footage, wherein Officer Moreland told Matthews he had knowledge that Matthews "just came from" the Yale Residence. (*See* Doc. No. 21 at PageID 61; *see also* Gov't. Ex. 5, Moreland Body Cam Footage, at 4:55.) That said, it was not unreasonable for law enforcement to conduct an initial *Terry* stop of Matthews and his vehicle. And because the dog alerted to the scent of drugs just a few minutes after Matthews' detention, there is no question that law enforcement had probable cause for the ensuing search of Matthews' vehicle. *See United States v. Sharp*, 689 F.3d 616, 618 (6th Cir. 2012) ("An alert to the presence of drugs by a properly trained narcotics detection dog is sufficient to establish probable cause to search a vehicle.").

Consequently, the Court sees no justification for applying the fruit-of-the-poisonous-tree doctrine to an otherwise lawful traffic stop and vehicle search.

**ii. Probable Cause Determination**

Having found the initial stop constitutional, the Court further concludes that the signatory judge had probable cause to issue Search Warrant 2 for the four cellphones found during the *Terry* frisk and vehicle search. As mentioned, the two Search Warrants at issue are practically identical—as are Matthews' arguments in favor of suppressing evidence gleaned from the execution of both—so it follows that the facts contained in Search Warrant 2 provide a sufficient nexus between the suspected criminal activity and the items searched.

Matthews attempts to analogize the facts of his case to *United States v. Ramirez*, 180 F. Supp. 3d 491 (W.D. Ky. 2016). (*See* Doc. No. 23 at PageID 104–05.) In *Ramirez*, the court found that the search warrant for the defendant's cell phones fell short of the probable cause standard because the affiant nebulously posited that cell phones store messages and electronic information, with no mention that the subject phone may have contained records of drug transactions. *Id.* at 493–94. In other words, the affidavit there was so vague and conclusory that it failed to establish a sufficient nexus between the suspected drug transactions and the defendant's phone. *Id.* The present case is patently distinguishable because Search Warrant 2 does indeed cite to the affiant's knowledge that "cellular phones are often used to facilitate drug sales." (Doc. No. 21-4 at PageID 85.) Because Search Warrant 2 does not suffer from the same ambiguity as the *Ramirez* search warrant, it does not succumb to the same ill fate. In sum, Matthews' scruples with Search Warrant 2 are unfounded, and the signatory judge had a substantial basis for his probable cause determination in its issuance.

## IV. CONCLUSION

Based on the foregoing, the Court hereby **DENIES** Matthews' Motion to Suppress Evidence and Statements (Doc. No. 17) and Brief in Support of Motion to Suppress (Doc. No. 23) in all respects.

**DONE** and **ORDERED** in Dayton, Ohio, this Thursday, October 29, 2026.

s/Thomas M. Rose

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE